**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 09-2097**

———————

PETROLEUM TRADERS CORPORATION, An Indiana Corporation,

Plaintiff - Appellee,

v.

BALTIMORE COUNTY, MARYLAND,

Defendant – Appellant,

and

JOHN E. BEVERUNGEN, Individually and in his Official
Capacity; FRED HOMAN, Individually and in his Official
Capacity; DEBORAH MEEHAN, Individually and in her Official
Capacity; JOYCE A. STROUPE, Individually and in her Official
Capacity; DAVID W. WOLFE, Individually and in his Official
Capacity; HARFORD COUNTY, MARYLAND; CARROLL COUNTY,
MARYLAND; COMMUNITY COLLEGE OF BALTIMORE COUNTY; ANNE
ARUNDEL COUNTY, MARYLAND,

Defendants.

———————

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Benson Everett Legg, Chief District
Judge. (1:06-cv-00444-BEL)

———————

Argued: October 28, 2010              Decided: January 12, 2011

———————

Before TRAXLER, Chief Judge, WILKINSON, Circuit Judge, and Bobby
R. BALDOCK, Senior Circuit Judge of the United States Court of
Appeals for the Tenth Circuit, sitting by designation.

———————

Affirmed by unpublished per curiam opinion.

**ARGUED:** John Edward Beverungen, Paul M. Mayhew, BALTIMORE COUNTY OFFICE OF LAW, Towson, Maryland, for Appellant.  Michael Scott Elvin, CHICO & NUNES, PC, Chicago, Illinois, for Appellee.  **ON BRIEF:** Adam M. Rosenblatt, Assistant County Attorney, BALTIMORE COUNTY OFFICE OF LAW, Towson, Maryland, for Appellant.  Joshua A. Glikin, BOWIE & JENSEN, LLC, Towson, Maryland; Andrew M. Spangler, Jr., Sandy L. Morris, CHICO & NUNES, PC, Chicago, Illinois, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Petroleum Traders Corporation ("PTC") prevailed below in a breach of contract action it brought against Baltimore County. The district court estopped Baltimore County from denying the existence of the contract, and we now affirm the judgment.

I.

Baltimore County is a member of the Baltimore Regional Cooperative Purchasing Committee ("BRCPC"), a group formed by the counties of the Baltimore metropolitan area for the purpose of jointly purchasing various commodities, including fuel.[*] In February 2004, the BRCPC issued an "Invitation to Bid" on the provision of gasoline and diesel fuel to its constituent counties for a time period running from April 1, 2004 through June 30, 2007. The Invitation set out the terms of the fuel purchasing agreement the BRCPC would enter into with the successful bidder. It explained that the contract would require the participating counties to purchase all of their fuel from the winning bidder. Additionally, the Invitation to Bid gave the counties the option to lock-in a fixed price for fuel over a set period of time instead of purchasing it at the prevailing

---

[*] The court grants PTC's motion to file a supplemental appendix in this action.

3

market price.  Under the lock-in option, the winning bidder was to purchase futures contracts to ensure an adequate supply at a fixed price.

PTC submitted a bid on March 11, 2004.  And on March 15, 2004, David Wolfe, a staff buyer for Baltimore County, informed PTC that it had won the bid and been awarded the contract. Approximately a month later, on April 11, 2004, Baltimore County issued a "Term Contract Award" to PTC signed by Deborah Herbold, a deputy purchasing agent for Baltimore County.  It stated, "This is notice that the contract . . . has been awarded to you . . . ."  Baltimore County purchased fuel under this agreement for approximately a year and half.  On behalf of the BRCPC, it elected to lock-in prices for three periods: May 17, 2004 through September 30, 2004; October 1, 2004 through January 31, 2005; and March 7, 2005 through June 30, 2005.  During each of these periods, the market price for fuel rose above the locked-in price, yielding considerable savings for Baltimore County.

In September 2005, oil prices began to rise in the wake of Hurricanes Katrina and Rita.  Baltimore County feared they would continue to rise and, accordingly, locked-in fuel prices for two additional periods, September 5, 2005 to December 5, 2005 and December 6, 2005 to April 2, 2006.  But oil prices soon began to fall.  And by November 2005, the price for fuel on the open market had fallen below the locked-in price.  This development

4

displeased the BRCPC member counties, and they demanded that PTC renegotiate the locked-in price. PTC, having already purchased the futures contracts, refused to do so.

Despite this friction, Baltimore County continued to follow its usual practice of locking-in fixed prices in advance, opting for a stable cost structure over the unpredictable swings of the market. In December 2005, on behalf of the BRCPC, it requested that PTC lock-in prices for an additional period, from April 3, 2006 through December 31, 2006. Before purchasing futures contracts, PTC first asked for estimates of the fuel requirements of the counties during this period and sought assurances that the BRCPC counties would honor the contract. Baltimore County construed this delay as a breach of their contract. Baltimore County then formally terminated the contract on December 7, 2005. PTC informed Baltimore County of the losses it would incur if the contract were terminated, but Baltimore County was unmoved. As a result, PTC was forced to liquidate its futures contracts for a considerable loss.

PTC brought suit against Baltimore County and the other BRCPC counties for breaching the fuel purchase contract. Whereas prior to suit Baltimore County had cited PTC's breach as the sole justification for its termination, Baltimore County added a new argument during litigation, contending that there was never a valid contract in the first place. The Baltimore

5

County Charter and Code required that the County Executive or his designee sign commodities contracts and that the County Attorney approve contracts for legal form and sufficiency. Baltimore County argued that the contract was not valid because these two contractual formalities had not been observed.

Baltimore County sought summary judgment on this basis, but the district court denied its motion on September 11, 2008. Although the court found the Charter and Code sections governing contracting to be confusing and ambiguous, it agreed with Baltimore County that the Charter and Code required the County Executive or his designee to sign the contract and the County Attorney to approve it for legal sufficiency. But the court went on to hold that Baltimore County could be estopped from denying the existence of the contract if PTC proved the elements of equitable estoppel at trial, which in this case primarily meant showing that it reasonably relied on Baltimore County's interpretation of its ambiguous Charter and Code provisions.

The case proceeded to trial. During the charging conference, the court noted that Baltimore County was arguing there was no contract while simultaneously arguing that there was a valid contract that PTC breached. Baltimore County recognized that a jury might not be receptive to these conflicting arguments and agreed that the court should decide whether there was a de facto contract because of equitable

6

estoppel. The court decided that there was. Accordingly, the court instructed the jury that it was to assume that there was an enforceable contract between Baltimore County and PTC.

Thus, the only substantive question for the jury was whether Baltimore County justifiably terminated the contract because of PTC's material breach. The jury found in favor of PTC and awarded it $590,397 in damages. Baltimore County now appeals, arguing that the application of equitable estoppel was improper.

## II.

Baltimore County contends that the district court erred in estopping it from denying the existence of a contract. First, Baltimore County argues that Maryland law prohibits the application of equitable estoppel against a governmental entity to cure a defective contract. Second, it claims that PTC failed to prove the elements of equitable estoppel as a matter of law. We will consider these contentions in turn.

## A.

Baltimore County argues that under Maryland law equitable estoppel can never be applied against a governmental entity to cure a defective contract. It grounds this rule in a trio of Maryland cases. See ARA Health Servs., Inc. v. Dep't of Pub. Safety & Corr. Servs., 685 A.2d 435 (Md. 1996); Inlet Assocs. v.

7

<u>Assateague House Condominium Ass'n</u>, 545 A.2d 1296 (Md. 1988); <u>Alternatives Unlimited, Inc. v. New Baltimore City Bd. Of School Comm'rs</u>, 843 A.2d 252 (Md. Ct. Spec. App. 2004).

Baltimore County contends that these cases establish that equitable estoppel is applied against governmental entities only in the rarest of circumstances. <u>See ARA Health Servs.</u>, 685 A.2d at 440; <u>Inlet Assocs.</u>, 545 A.2d at 1308; <u>Alternatives Unlimited, Inc.</u>, 843 A.2d at 258. The County argues that representations of a government official can estop the governmental entity from contesting the validity of a contract only when the official has actual authority to enter into the contract; apparent authority alone is not sufficient for an equitable estoppel claim against a governmental entity. <u>See ARA Health Servs.</u>, 685 A.2d at 440. Therefore, Baltimore County reasons, equitable estoppel is not available to PTC because Herbold, the only signatory to the Term Contract Award, had no actual authority to enter into a contract without the signature of the County Executive or his designee and the approval of the County Attorney as to legal form and sufficiency.

### B.

Baltimore County is correct that equitable estoppel is applied narrowly against governmental entities and that a government official's representations outside the scope of his authority are insufficient to estop the governmental entity.

8

But these two propositions of law do not end the matter. Maryland law is not as clear as Baltimore County would have us believe, and another line of Maryland cases carve out a limited place for equitable estoppel in the context of government contracting.

For over a hundred years, Maryland law has allowed equitable estoppel to be asserted against governmental entities when "both parties to the transaction have acted and proceeded as if all preliminary formalities and regulations had been complied with, and rights have attached." Rose v. Baltimore, 51 Md. 256, 271-72 (1879). And Maryland's highest court has since reaffirmed this rule, tracing the contours of equitable estoppel's role in government contracting: "[T]he doctrine of [equitable estoppel] is applied to municipal . . . corporations . . . at least where the acts of its officers are within the scope of their authority and justice and right require that the public be estopped." Berwyn Heights v. Rogers, 179 A.2d 712, 716 (Md. 1962).

Other cases have fleshed out the exact parameters of the rule. Permanent Financial Corp. v. Montgomery County, 518 A.2d 123 (Md. 1986), makes clear that equitable estoppel is appropriate when a government official, acting within the scope of his authority, offers a reasonable interpretation of an ambiguous law. Id. at 129. The case involved a developer who

9

began construction pursuant to a permit issued by the county. Id. at 124. But the county later changed its longstanding interpretation of an ambiguous zoning ordinance. Id. at 129. Under the new interpretation, the developer had violated the ordinance. Id. at 124. The Maryland Court of Appeals estopped the county from changing its interpretation of the ordinance because the developer had reasonably relied on its interpretation of the ambiguous provision. Id. at 129-30.

Heartwood 88, Inc. v. Montgomery County, 846 A.2d 1096 (Md. Ct. Spec. App. 2004), was similarly decided. The case concerned an advertisement for a tax sale promising that in the event a sale was invalidated, the county would refund any payments along with eight percent interest. Id. at 1101. After providing one such refund, the county modified its interpretation of the law and claimed that it did not have legal authority to pay the eight percent interest. Id. at 1102. The Maryland Court of Special Appeals found estoppel to be appropriate because the representations in the advertisement were made within the scope of the official's authority and embodied the county's reasonable interpretation of an ambiguous law. Id. at 1119-20.

Additional cases set forth two further factors. The first is whether the governmental entity behaves as if there were a contract. The second is that the analysis should not become bogged down in determining whether mere contracting formalities

10

were observed.  For example, in <u>Hagerstown v. Hagerstown Railway Co. of Washington County</u>, 91 A. 170 (Md. 1914), the Maryland Court of Appeals estopped a city from denying the existence of a contract.  The case involved a city that had contracted with a power company for electricity.  <u>Id.</u> at 171-72.  But after many years of proceeding under this agreement, the city decided to build its own power plant and sought to void the contract, claiming that certain contractual formalities had not been observed.  <u>Id.</u> at 172.  The Maryland Court of Appeals found two aspects of the case to be dispositive: the city had the power to enter into the contract, regardless of whether all the formalities were observed, and the city had behaved as if there were a contract in place for all the years prior to the litigation.  <u>Id.</u> at 174-75.

Similarly, in <u>Baltimore v. Crown Cork & Seal Co.</u>, 122 F.2d 385 (4th Cir. 1941), this court estopped a city from denying its division of riparian rights among itself and several landowners. Seeking to void the arrangement, the city argued that it had not followed the proper legal procedures when it instituted the division plan.  <u>Id.</u> at 388.  Specifically, the city had never adopted the plan by a formal ordinance.  <u>Id.</u>  But the court refused to be distracted by the absence of formalities: "[T]he City cannot avoid [estoppel] by the plea that it did not

11

exercise the powers conferred upon it in the proper fashion." Id. at 390.

To sum up, Maryland law allows a governmental entity to be equitably estopped when: (1) a government official acting within the scope of his authority (2) makes a reasonable interpretation of an ambiguous law; and (3) the governmental entity has proceeded in accordance with the representation.

## III.

Baltimore County contends that PTC cannot meet the first and second elements of the test derived above. Specifically it claims that Herbold, the deputy purchasing agent, did not have actual authority to enter into the contract on behalf of the county and that the Baltimore County Charter and Code provisions are unambiguous.

## A.

Baltimore County may be correct that Herbold alone did not have authority to contract on behalf of the county, but that is not the relevant issue. The dispositive question, rather, is whether Baltimore County officials acted within the scope of their authority when they entered into the contract with PTC. And Baltimore County's narrow focus on Herbold neglects this broader picture.

12

The Baltimore County Charter and Code vest considerable authority with the County Purchasing Agent, Fred Homan. Section 902 of the Baltimore County Charter authorizes the County Purchasing Agent to "[make] all purchases and [contract] for all public work and services, and for all supplies, material and equipment [for the county]," a power "which he may delegate" to any of his deputies, including both Herbold and Wolfe. Section 904 grants the County Purchasing Agent further power regarding soliciting bids and awarding contracts. And § 10-2-310 of the Baltimore County Code empowers the County Purchasing Agent to make purchases under cooperative purchase agreements, such as those used by the BRCPC.

As these provisions indicate, Homan had the authority to enter into contracts on behalf of the county. In the agreement with PTC, he delegated this authority to Wolfe and Herbold. This delegation was proper. It in no way undermines the critical fact that when Wolfe and Herbold awarded PTC the contract, their actions were backed by the full authority of Homan, who was expressly authorized by the Baltimore County Charter and Code to contract on behalf of the county in a cooperative purchasing situation such as this.

Beyond Homan, Wolfe, and Herbold, still more county officials assured PTC that the contract was valid. County Administrative Officer Anthony Marchione, who was the County

13

Executive's designee, consented to the contracting protocols in place before and during PTC's contract. Assistant County Attorney Joyce Stroupe was more direct, sending a letter to PTC invoking the provisions of the Invitation to Bid as if it were a valid contract.

It is true that Marchione and Stroupe did not observe the requisite contractual formalities, but Hagerstown Railway makes plain that a singular focus on formalities is not always conclusive in equitable estoppel cases. 91 A. at 174-75. What is important is that Marchione, Stroupe, and Homan collectively had the authority to enter into contracts on behalf of Baltimore County, and all of them affirmed the validity of the PTC contract.

Furthermore, this is not a case where an individual or even a small group of people were the only ones making allegedly erroneous representations. The entire Baltimore County government operated for years under its reasonable interpretation of the Baltimore County Charter and Code, namely that the County Purchasing Agent could enter into commodities contracts without obtaining the signatures of the County Executive and County Attorney. Indeed, Baltimore County had even drafted its official contracting procedures manual based on this interpretation. And it had entered into over 5,000 contracts using the very same protocols that were used in the

14

PTC contract.  In all that time, no Baltimore County official even hinted that the County's contracting protocols were faulty. Rather, every indication was that Baltimore County followed consistent and proper contracting procedures.

It is hardly dispositive, therefore, whether Herbold, acting alone with only her own authority, could enter into contracts on behalf of the county.  All of the relevant Baltimore County officials gave their blessing to the PTC contract, and the county as a whole demonstrated its view that the contract was valid based on its longstanding contracting procedures.

B.

As for the second element, Baltimore County argues that the Baltimore County Code and Charter contracting provisions are unambiguous.  According to Baltimore County, the relevant provisions plainly require that the County Executive or his designee sign the contract and the County Attorney approve it for legal form and sufficiency.  But the Baltimore County Charter and Code are not the model of clarity Baltimore County suggests.

As discussed above, Baltimore County Charter §§ 902 and 904 and Baltimore County Code § 10-2-310 give the County Purchasing Agent broad powers to negotiate and enter into commodities contracts on behalf of the county, especially in cooperative

15

purchase agreement settings like the PTC contract. Other provisions, namely Baltimore County Code § 10-2-306, together with Baltimore County Charter §§ 402 and 508, require that all contracts be signed by the County Executive or his designee and that the County Attorney approve all contracts for legal form and sufficiency.

Although the district court ultimately determined that the formalities embodied in Baltimore County Charter §§ 402 and 508 must be observed for a commodities contract to be valid, it first noted that the Baltimore County Charter and Code were ambiguous on this issue. We agree. As we have noted, Baltimore County Charter §§ 902 and 904 and Baltimore County Code § 10-2-310 vest considerable contracting authority with the County Purchasing Agent, especially in the area of cooperative commodities contracts. Based on Baltimore County's longstanding practice, the County Purchasing Agent was allowed to enter into commodities contracts without observing the formalities required by §§ 402 and 508. And though this interpretation exempting commodities contracts from these formalities may ultimately have been erroneous, the district court was right to note that the interpretation was not an unreasonable one.

C.

The final element of the estoppel test presents a powerful rationale for affirmance. Baltimore County behaved as though

16

there were a contract throughout the course of the agreement. Indeed, the County does not even dispute this conclusion. Perhaps this is because Baltimore County was more than willing to treat its agreement as a valid contract when it was advantageous for it to do so.

During the course of the agreement, Baltimore County locked-in prices with PTC five times, placed numerous purchase orders for fuel from PTC, and received over $11,000,000 worth of fuel from PTC. All of this took place in the manner contemplated by the Invitation to Bid, and Baltimore County reaped the savings of purchasing fuel for less than the market price for the first three lock-in periods. Moreover, Baltimore County repeatedly invoked the terms of the agreement in its dealings with PTC. Wolfe and Stroupe both wrote letters to PTC in which they highlighted particular provisions of the agreement. And Baltimore County even went so far as to threaten PTC that it would be in breach if it failed to perform in accordance with the terms of the contract.

Even when the market price for fuel fell below the locked-in price and Baltimore County was losing money as a result of the agreement, it tried to get out of the arrangement not by denying the existence of a contract but by declaring PTC to be in material breach. It was not until the instant litigation that Baltimore County changed its interpretation of its Charter

17

and Code in a way that sought to invalidate the PTC contract. And even then, Baltimore County was selective with its new interpretation, seeking to invalidate only the PTC contract while simultaneously performing under thousands of other contracts that also lacked the formalities at issue here. In sum, Baltimore County is continuing to act as if the contracting procedures used for the PTC agreement are adequate to produce valid contracts while asserting the invalidity of its contract with PTC.

IV.

The fact that equitable estoppel is available does not end the analysis. PTC must prove its elements to prevail, and Baltimore County argues that it failed to do so. The elements of equitable estoppel under Maryland law are: (1) voluntary conduct or representation; (2) reasonable reliance; and (3) detriment as a result of the reliance. Heartwood 88, 846 A.2d at 1116. Baltimore County claims that PTC has not satisfied the reasonable reliance element because it failed to perform due diligence before relying on the representations of Baltimore County officials and entering into the agreement. But the facts do not support Baltimore County's contention.

PTC reasonably relied on the representations of Baltimore County officials conveying their belief that its contracting

18

procedures were lawful. The first such representation came in the Invitation to Bid, which set out the terms of the contract and indicated that submitting a bid constituted acceptance of those terms. Wolfe's letter informing PTC that it won the contract is another representation. And the Term Contract Award is yet another. These documents made clear that there was a contract between Baltimore County and PTC.

Baltimore County's course of conduct during the term of the contract encouraged this reliance. Every Baltimore County purchase order issued to PTC reaffirmed PTC's belief that it had a contractual relationship with Baltimore County. Each time Baltimore County requested prices to be locked-in for a period, PTC reasonably relied on Baltimore's County's representation that it would purchase the fuel for the locked-in price. Baltimore County's repeated invocations of the contractual terms in correspondence with PTC further reinforced the conclusion that there was a contract. PTC's reliance was reasonable given the numerous and consistent representations of Baltimore County officials.

Furthermore, if PTC had hired legal counsel to investigate the proper contracting procedures, as Baltimore County insists it should have, the result would have been the same. As long as the market favored Baltimore County, its officials would have assured PTC that a valid contract was in place. Indeed, no

Baltimore County official questioned this fact until it sought to extricate itself from the PTC contract when the market turned. The district court and jury correctly surmised that the entire matter turned on Baltimore County's refusal to honor its agreement, and nothing on appeal has drawn that conclusion into question.

V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.